

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JRS/MWG
F. #2019R00447

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 30, 2022

<u>By ECF</u>

The Honorable Raymond J. Dearie
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

        Re:    United States v. Corey Mobley
                 Criminal Docket No. 19-221 (S-3) (RJD)

Dear Judge Dearie:

        The government respectfully submits this letter in advance of the sentencing of the defendant Corey Mobley, which is currently scheduled for October 14, 2022, at 11:00 a.m. On June 14, 2021, pursuant to a plea agreement with the government, the defendant pleaded guilty to the following charges in the Third Superseding Indictment: (1) one count of committing or threatening physical violence in furtherance of a plan to commit robbery, in violation of 18 U.S.C. § 1951(a) (Count Two); (2) one count of Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count Five); and (3) two counts of brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii) (Counts Three and Eight).  As the Court knows from presiding over the recent trial of co-defendant Lamonte Johnson, Mobley was one of a group of robbers who committed or attempted to commit a series of robberies primarily targeting Chinese-Americans in 2019.  In particular, on one occasion, Mobley participated in a home invasion robbery during which he sexually assaulted a woman.  Separately, Mobley participated in the violent armed robbery of a drug dealer in Brooklyn earlier in 2019.  For the reasons discussed below, the government submits that a sentence within the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 255 to 276 months' imprisonment—including two consecutive 84-month mandatory minimum sentences on Counts Three and Eight—would be sufficient, but not greater than necessary, to achieve the goals of sentencing set forth at 18 U.S.C. § 3553(a).

I.      Background

    A.      The Offense Conduct

        1.      The Robbery of John Doe

On March 2, 2019, the defendant Corey Mobley and Gabriel Stroia participated in the armed robbery of a drug dealer ("John Doe") in Brooklyn, New York based on information supplied by Ivan Eli. Mobley and Stroia ambushed John Doe in the stairwell of his apartment building, beat John Doe with a firearm, and then dragged John Doe inside his apartment. Once inside, Mobley and Stroia tied up John Doe with duct tape and repeatedly beat John Doe in the head and face with a firearm while demanding money and drugs. Mobley and Stroia managed to steal approximately one kilogram of cocaine and approximately $40,000 in cash. See Presentence Investigation Report ("PSR") ¶¶ 11-25.

        2.      The Conspiracy to Rob Chinese-Americans

From approximately March to May 2019, Mobley participated in a conspiracy with Lamonte Johnson, Shi Zhen Lin, John Martin, Brandon Daniels, and Ivan Eli to commit armed robberies in New York with the goal of stealing narcotics and commercial proceeds. Johnson and Lin knew each other because they were previously incarcerated together at the Sing Sing Correctional Facility. Johnson, who was incarcerated at Auburn Correctional Facility during the entire period of the conspiracy, is Martin's brother. Johnson introduced Lin and Martin for the purpose of committing robberies, with the expectation that Johnson would get a share of any money that the robbery crew stole. Lin, in turn, identified Chinese-American victims for Martin and others to rob. See PSR ¶¶ 8-10.

        3.      The New Brunswick Robbery

In furtherance of the conspiracy, Martin, Mobley, and Eli traveled to New Brunswick, New Jersey, on March 29, 2019, to commit a robbery based on information provided by Lin. The robbers believed that their intended victims were going to be carrying a large amount of cash. Mobley, who was armed with a gun, planned to ambush the intended victims outside their apartment. Eli disagreed with the plan as too risky and later noticed security cameras in the complex, so the robbers decided to abandon their plan and left the area. See PSR ¶ 26.

The following week, on April 6, 2019, cell site evidence shows that Martin and Mobley (without Eli) traveled back to the same area in New Brunswick, New Jersey. Consistent with Lin's role in the conspiracy as the source of information for Martin, phone records show an unusual volume of calls between Lin and Martin on that day. Later that evening, Johnson spoke with Martin on a telephone call that was recorded by the state prison at which Johnson was incarcerated. After stating that he was coming back from New Jersey with Mobley, Martin bragged to Johnson about how much money he and Mobley had just stolen. Martin and Johnson also discussed that the robbery was based on information from "Kev" (Lin's anglicized nickname is Kevin), and that they hoped to obtain other jobs from "Kev" in the future. See PSR ¶ 27.

The following day, April 7, 2019, Johnson, Martin, and Lin spoke by telephone (also recorded by the state prison) and discussed division of the robbery proceeds—approximately $170,000 total, consisting of $120,000 of cash "plus other 50, the jump ball." On that call and on later calls between Johnson and Martin, the two discussed how Johnson had introduced Martin and Lin, that Johnson knew Lin from Sing Sing (where they had both been incarcerated), and that Johnson was entitled to a portion of whatever proceeds Martin made as a result of working with Lin. That same day, based on cell site data, Martin and Lin traveled to the same location in Queens and spoke on the phone, which is consistent with their meeting to divide the proceeds. In a later call between Johnson and Martin, Martin confirmed that he had met with "Kev." See PSR ¶ 28.

### 4. The Staten Island Attempted Robbery

The next month, on May 3, 2019, Daniels, Martin, Mobley, and Eli traveled to Staten Island to commit a home-invasion robbery. The robbers believed that their intended victims were going to have large amounts of cash and jewelry. Daniels and Mobley were both armed with firearms and had a robbery kit of masks, gloves and zip ties. The robbers traveled to a wooded area outside the victims' home where they waited for one of the targets to take out the trash. But when two women finally came out of the house, the robbers realized they were too far away to push their way inside without scaring off the women. They therefore decided to call off the robbery at the last second. See PSR ¶ 29.

### 5. The Queens Home Invasion Robbery

As part of the same conspiracy, Martin, Mobley, and Daniels participated in an armed home invasion robbery in Little Neck, Queens, on May 4, 2019. (Mobley asked Eli to attend, but Eli declined.) Much of the robbery was caught on audio-video surveillance from cameras located inside and outside the home, which were admitted in evidence and published to the jury at Lamonte Johnson's trial. The occupants of the home were five adults, including an elderly disabled woman, and three young children. See PSR ¶ 30.

On May 4, 2019, at approximately 9:30 p.m., Daniels and Mobley forced their way into the victims' home, with Daniels brandishing a firearm. Once inside the home, Daniels and Mobley forced the screaming occupants into a downstairs bedroom. Because the elderly woman in the home could not walk, Mobley dragged her and the young child she was holding across the floor into the room. Daniels and Mobley immediately asked their victims where the camera system in the home was located. Then they told the victims that they knew there was money in the house, and they were not leaving without the money. Daniels and Mobley searched and ransacked the upstairs bedrooms, including by searching inside the air conditioning vents in the ceiling. Mobley threatened to kill all of the occupants if they did not tell the robbers where the money was. Consistent with Eli's testimony that the robbers expected to find tens of thousands of dollars in narcotics proceeds, Daniels and Mobley continued to demand money even after one of the occupants ("Victim 1") gave them a few thousand dollars that had been set aside as a gift for the family. See PSR ¶ 31.

During the robbery, Daniels pulled Victim 1 out of the downstairs bedroom, brought her upstairs, and demanded to know where the money was. Victim 1, who testified at

3

Lamonte Johnson's trial, told Daniels that she did not know where any money was located because the house belonged to her brother, who was not home. Daniels threatened to "do things" to her if she did not give him the money. When she continued to insist that she did not know about any money, Daniels pulled down his pants and Victim 1's pants, and then Daniels rubbed his penis against Victim 1's anus while holding a gun to her back. See PSR ¶ 32.

At approximately 9:40 p.m., Mobley called Martin, told him that he and Daniels were inside, and asked Martin to come inside. Martin, who had been on the phone with Johnson at the time, ended his call with Johnson, and video surveillance from inside the house shows that Martin entered the house. The surveillance video shows that Martin was in the home for several minutes, spoke to Daniels and Mobley, and then went back outside to a four-door sedan. According to cell site data, Martin remained in the area for the next fifteen minutes and continued calling his co-conspirators inside the home, with one call to Daniels and over a dozen calls to Mobley. Phone records also show that, while the robbery was taking place, Martin exchanged numerous phone calls with Lin. See PSR ¶¶ 35-36.

After Martin went back outside, Mobley and Daniels continued to demand money. When Victim 1 remained unable to provide money, Mobley pulled her into her mother's bedroom, where he also sexually assaulted her by pulling down her pants and rubbing his penis against her anal area. Mobley then took her Victim 1 back to the room where her children were being held and threatened to kill Victim 1's children or her mother, stating, "Who's it going to be, your mother or your children?" When Victim 1 still could not produce money, Mobley stated, "All right, shoot the kids," causing Victim 1 to break down hysterically crying. See PSR ¶¶ 33-34.

Mobley insisted Victim 1 was "playing games." He pulled her into her mother's bedroom, where he sexually assaulted her for the third time that night. Mobley threw Victim 1 onto her mother's bed and inserted his fingers into her vagina. Mobley attempted to insert his penis into Victim 1's vagina but was unable to maintain an erection. Mobley then forced Victim 1 to perform oral sex on him until he ejaculated in her mouth. Video surveillance then shows Mobley take Victim 1 to the bathroom, where he told her to rinse out her mouth. See PSR ¶ 37.

Daniels and Mobley fled the scene in an SUV at approximately 10:10 p.m.—the same time that Martin's cell site records show that he left the area in his separate car. Later that night, all three men reunited at Daniels's apartment in Brooklyn, where Lin and Martin called each other several additional times. See PSR ¶ 37.

Cell site data for Daniels, Martin, and Mobley place all three at the location of the robbery. In addition, Daniels's DNA was identified on fragments of blue latex gloves found at the scene and on Victim 1's clothes, and Mobley's DNA was identified on stains on Victim 1's clothes and from a sperm found inside her mouth. Victim 1 later identified Mobley from a photo array as one of the robbers. See PSR ¶ 38.

6.   The Suffolk County Attempted Robbery

Finally, Daniels, Eli, and Mobley attempted to rob a family in Suffolk County, New York on May 5, 2019, based on information that Lin gave to Martin. Specifically, Lin gave

4

Martin information about a Chinese family living in Setauket, Long Island that was believed to have $1 million cash hidden in the walls of their home. Cell site evidence shows that Martin cased the residence on March 14, 2019, and when Martin was at the location, he spoke by phone with Lin. Daniels, Eli, and Mobley went back to Setauket to commit the home invasion robbery on the evening of May 5, 2019—the day after the Queens home invasion. The robbers broke into the garage and were planning to enter the home armed with guns. However, as Eli testified at Johnson's trial, Eli thought Mobley's plan to rush into the home was too risky, so Eli tricked Mobley into believing that the home had an alarm system. The robbers then left the garage without entering the house. See PSR ¶ 40.

B. The Defendant's Criminal History

These crimes were not the defendant's first involvement in robberies. To the contrary, the defendant has spent almost his entire adult life in prison for armed robbery convictions. Specifically, in the summer of 1994, the defendant and two others committed two separate armed robberies of jewelry stores in Floral Park, New York. The defendant was convicted at trial of two counts of robbery in the first degree and two counts of robbery in the second degree. For these violent crimes, the defendant was sentenced to 24 years' imprisonment (12 years on each count of robbery in the first degree to run consecutively to each other). See PSR ¶ 97.

The defendant did not adjust well to prison. As reflected in the PSR, the defendant had an uninterrupted history of disciplinary incidents from 1995 through 2018. These incidents included multiple infractions for fighting, violent conduct, weapons possession, drug possession, and smuggling. See PSR ¶ 97.

The defendant was released to parole supervision in May 2018. See PSR ¶ 97. Not long after his release, and while still on parole, the defendant committed the instant offenses.

C. Victim Impact

Victim 1 of the Queens robbery, who testified at Lamonte Johnson's trial, has submitted a statement describing the traumatic impact of the armed home invasion on the lives of herself and her family. She describes how that night "haunts" her to this day with memories of Daniels and Mobley "threatening to kill my young son, gun pointed to his head," and being sexually assaulted by both men "while my mom and children could only hear me whimpering, and not know why." These horrific experiences have left Victim 1 feeling unsafe in her own home, and anxious and embarrassed by the publicity that this home invasion received by the media. She has "endured sleepless, tear-filled nights over the last three years" that she has struggled to keep from her young children, because she wants to "be strong for them" while they cope with the trauma themselves. Her young children felt "scared to continue with their lives after the incident"—"insist[ing] on going home whenever it got dark outside," "shut[ting] off the television whenever they see any robbery scenes," and expecting that "people intend to harm them." PSR ¶ 41.

II.      <u>The Sentencing Guidelines</u>

The government agrees with the Probation Department's calculation of the Guidelines Offense Level, which is as follows:

<u>Count Two: Queens Robbery on May 4, 2019</u>

| | |
|---|---:|
| Base Offense Level (§ 2B3.1(a)) | 20 |
| Plus: A victim sustained serious bodily injury (§ 2B3.1(b)(3)(B)) | +4 |
| Plus: A person was restrained to facilitate commission of the offense (§§ 2B3.1(b)(4)(B) & 3A1.3) | +2 |
| Plus: Vulnerable victim (§ 3A1.1(b)(1)) | <u>+2</u> |
| Total: | <u>28</u> |

<u>Count Five: Brooklyn Robbery on March 2, 2019</u>

| | |
|---|---:|
| Base Offense Level (§ 2B3.1(a)) | 20 |
| Plus: Controlled substances were taken (§ 2B3.1(b)(6)) | +1 |
| Plus: Loss of more than $20,000 (§ 2B3.1(b)(7)(B)) | +1 |
| Plus: A victim sustained serious bodily injury (§ 2B3.1(b)(3)(B)) | +4 |
| Plus: A person was restrained to facilitate commission of the offense (§§ 2B3.1(b)(4)(B) & 3A1.3) | <u>+2</u> |
| Total: | <u>28</u> |

Multiple Count Analysis

Highest Adjusted Offense Level: 28

|  | Level | Units |
|---|---|---|
| Group 1: Queens Robbery | 28 | 1.0 |
| Group 2: Brooklyn Robbery | 28 | 1.0 |
| Total Number of Units: |  | 2.0 |

Plus: 2.0 Units (§ 3D1.4) +2

Less: Timely acceptance of responsibility (§ 3E1.1) -3

Total Adjusted Offense Level: 27

PSR ¶¶ 67-94. Based on the defendant's criminal history, including the fact that the defendant committed the instant offenses while under parole supervision, the defendant is in Criminal History Category III. Id. ¶¶ 96-100. Accordingly, the applicable Guidelines range prior to the mandatory minimum sentences for Counts Three and Eight is 87 to 108 months' imprisonment. Id. ¶ 139. When the mandatory minimum sentences are added, the effective Guidelines range is 255 to 276 months' imprisonment. Id. The defendant does not dispute this calculation. (See Def.'s Sentencing Mem. 2.)

III. A Guidelines Sentence of 255 to 276 Months' Imprisonment Is Warranted

The government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 255 to 276 months' imprisonment. Such a sentence would be sufficient, but not greater than necessary, to reflect the seriousness of the defendant's offense, the need for deterrence, and to achieve the other purposes of sentencing.

"[I]n the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" Kimbrough v. United States, 552 U.S. 85, 109 (2007); see also United States v. Fernandez, 443 F.3d 19, 27 (2d Cir. 2006) ("[I]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."). Indeed, the Supreme Court has held that, on appeal, a Guidelines sentence may be presumed to be reasonable because "the sentencing statutes envision both the sentencing judge and the [Sentencing] Commission as carrying out the same basic § 3553(a) objectives." Rita v. United States, 551 U.S. 338, 358 (2007). "An individual judge who imposes a sentence within the range recommended by the Guidelines thus makes a decision that is fully consistent with the Commission's judgment in general." Id. at 350. Furthermore, Guidelines sentences promote Congress' goal in enacting the Sentencing Reform Act: "to diminish unwarranted sentencing disparity." Id. at 354.

7

A Guidelines sentence in this case would reflect the serious nature of the offense and promote respect for the law. See 18 U.S.C. §§ 3553(a)(1), 3553(a)(2)(A). There can be no question that armed robbery is an extremely serious crime under any circumstance. See Graham v. Florida, 560 U.S. 48, 69 (2010) (observing that robbery is "a serious crime deserving serious punishment"); United States v. Mendola, 807 F. Supp. 1063, 1065 (S.D.N.Y. 1992) (noting that armed robbery "is one of the more serious federal crimes."). The offense conduct here was particularly appalling. Over just a few months, Mobley committed multiple armed robberies that involved serious violence. During the armed robbery of John Doe, Mobley and Stroia tied up John Doe and beat him in the head and face with a firearm. Just a few months later, Mobley and Daniels physically and emotionally brutalized the family in Little Neck, Queens. Mobley, in particular, sexually assaulted Victim 1 on two separate occasions in her mother's bedroom, while Victim 1's mother and young children were in the next room, and he repeatedly threatened to kill Victim 1's mother and children. Nothing can excuse or explain Mobley's depraved conduct toward Victim 1 and her family—conduct that will haunt them for the rest of their lives.

Moreover, the need for deterrence, both general and specific, supports a sentence within the Guidelines. See 18 U.S.C. §§ 3553(a)(2)(B). With respect to specific deterrence, the defendant participated in numerous armed robberies and attempted armed robberies shortly after completing a twenty-four-year prison sentence for prior armed robberies. This lengthy term of imprisonment plainly did not deter Mobley from continuing to commit violent crimes. To the contrary, shortly after his release from prison, the defendant committed crimes even more violent than before—crimes including beating one victim in the face with a firearm and sexually assaulting another victim multiple times. Accordingly, a lengthy sentence of imprisonment is necessary to send a message to this defendant that his repeated criminal conduct will be justly punished. In addition, a Guidelines sentence is necessary to send a clear message to the community that recurrent violent behavior, including armed robberies and sexual violence, will result in a substantial prison sentence.

Relatedly, a Guidelines sentence would also account for the history and characteristics of the defendant. See 18 U.S.C. § 3553(a)(1). While the government acknowledges the mitigating facts of the defendant's childhood that are reflected in his sentencing submission, those facts cannot excuse Mobley's history of serious violent conduct and his decision to continue committing armed robberies shortly after his release from prison. Mobley's actions prove that he is likely to recidivate, and a substantial sentence is necessary to protect the community from future acts of violence by him. See 18 U.S.C. § 3553(a)(2)(C).

A Guidelines sentence is also appropriate to avoid unwarranted sentencing disparities with others convicted of similar conduct. See 18 U.S.C. § 3553(a)(6). According to data from the United States Sentencing Commission, in cases such as this one, involving application of U.S.S.G. § 2B3.1, a Guidelines offense level of 27 and a criminal history category of III, as well as at least one conviction under 18 U.S.C. § 924(c), from 2017 to 2021, 100% percent of defendants received a sentence of imprisonment, with an average sentence for imprisoned defendants of 222 months and a median sentence for imprisoned defendants of 180 months. This data does not separately account for defendants, like Mobley, who have not one, but two convictions under 18 U.S.C. § 924(c). See Judiciary Sentencing Information (JSIN), United States Sentencing Commission, https://jsin.ussc.gov. There is no basis to treat Mobley substantially less seriously than the average defendant. If anything, given the extraordinary

violence committed by Mobley, including the depraved sexual violence against Victim 1, he is substantially more culpable than the average or median defendant.

The conditions at the MDC Brooklyn during the ongoing COVID-19 pandemic do not warrant a sentence below the Guidelines range, as Mobley advocates. Although "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures," United States v. Carty, 264 F.3d 191, 196 (2d Cir. 2001), in evaluating the reasonableness of a sentence imposed at the low end of the applicable Guidelines range, the Second Circuit recently held that there is "no authority suggesting that a district court imposing a sentence is obligated to assign even this much weight [i.e., a sentence as the low end of the applicable Guidelines range], let alone more, to the harsh prison conditions brought on by the pandemic," United States v. Edwards, No. 21-1248, 2022 WL 1553455, at *2 (2d Cir. May 17, 2022). Here, a downward departure or variance is unwarranted due to the particularly heinous nature of Mobley's crimes and his substantial history of violence crime.

Finally, because the defendant's crimes were also prosecuted by state authorities, and because the defendant has not yet been sentenced in the state for those crimes, U.S.S.G. § 5G1.3(c) applies. Accordingly, the Court should "impose[] [the sentence] to run concurrently to the anticipated term of imprisonment" on the state conviction. U.S.S.G. § 5G1.3(c).

IV.  Conclusion

For the foregoing reasons, the government respectfully submits that a Guidelines sentence of 255 to 276 months' imprisonment would be sufficient, but not greater than necessary, to achieve the goals of sentencing in this case.

Respectfully submitted,

BREON PEACE
United States Attorney

By:  /s/
Jonathan Siegel
Michael W. Gibaldi
Assistant U.S. Attorneys
(718) 254-6293/6067

cc:  Clerk of the Court (RJD) (by ECF)
Counsel of Record (by E-Mail and ECF)
Senior United States Probation Officer Roberta Houlton (by E-Mail)